## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Haven Trust Bank,**

|  |  |
|---|---|
| **Plaintiff,** | **JURY DEMANDED** |
| **v.** | **CIVIL ACTION NO.** |

**EDWARD BRISCOE, KEN
CUTSHAW, SCOTT DIX,
BRIJ KAPOOR, BALVANT  R.
PATEL, DHIRU PATEL, KUNAL
S. PATEL, MUKESH PATEL,
MUKUND PATEL, NARENDRA
D. PATEL, R. C. PATEL, B. RUTH
STRICKLAND, ALAN TALLIS,
MICHAEL F. JOHNSTON, and
MARK DONOVAN,**

        **Defendants.**

## COMPLAINT FOR DAMAGES

Plaintiff Federal Deposit Insurance Corporation, as Receiver for Haven Trust

Bank ("FDIC"), states its complaint against the Defendants, and each of them, as

follows:

# I.  INTRODUCTION

1.     The FDIC brings this action in its receivership capacity against certain former directors and officers of Haven Trust Bank ("Bank").   The Georgia Department of Banking closed the Bank on December 12, 2008, less than ten years after it was formed.   The failure of the Bank is currently estimated to cost the Federal Deposit Insurance fund $248 million.

2.     In derogation of their duty to engage in safe and sound banking practices, Defendants implemented an unsustainable business model that pursued rapid asset growth concentrated in high risk Commercial Real Estate ("CRE") loans without adequate internal controls, loan underwriting policies, and credit administration procedures necessary to oversee and manage the operations of the Bank.

3.     The FDIC seeks recovery from these directors and officers for losses of approximately $40 million that the Bank suffered in connection with (a) high risk acquisition development and construction ("ADC") loans and other types of imprudent commercial real estate ("CRE") loans, (b) improper loans to insiders, and (c) imprudent dividend payments to the Bank's parent corporation.  The wrongful acts and omissions of the Defendant directors and officers were the direct and

proximate cause of the Bank's losses, and the FDIC asks that Defendants be held accountable for the losses resulting from their wrongful acts and omissions.

## II.  JURISDICTION AND VENUE

4.     This court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 et seq.; 12 U.S.C. §1819(b)(1), (2)(A); 28 U.S.C. §§1331, 1345. The FDIC is a corporation organized and existing under the laws of the United States of America and actions to which the FDIC is a party are deemed to arise under the laws of the United States.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because all or substantially all of the acts charged herein occurred in this district and the claims arose in this district.

## III.  PARTIES

6.     The FDIC is a corporation organized and existing under the laws of the United States of America with its principal place of business in Washington, D.C. The FDIC appears in this matter in its receivership capacity as receiver of Haven Trust Bank, Duluth, Georgia, which institution was insured by the FDIC.  Under 12 U.S.C. § 1821(d)(2)(A) and § 1823(d)(3)(A), the FDIC has, among other powers, all rights, titles, powers and privileges of the insured depository institution, and of

account holders, depositors and stockholders with respect to the institution and its assets.

7.     On information and belief, Defendant Edward Briscoe is a resident citizen of Lawrenceville, Georgia.  During the times pertinent to the events giving rise to the claims asserted herein, Edward Briscoe served as both a Director of the Bank and as the Bank's Chief Executive Officer.  As a Director, Edward Briscoe served on the Executive Committee and the Loan Committee.

8.     On information and belief, Defendant Ken Cutshaw is a resident citizen of Atlanta, Georgia.  Ken Cutshaw served as a Director of the Bank from 2006 until September 2008.

9.     On information and belief, Defendant Scott Dix is a resident citizen of Atlanta, Georgia.  Scott Dix served as a Director of the Bank from at least 2001 until the Bank closed in December 2008.

10.     On information and belief, Defendant Brij Kapoor is a resident citizen of Atlanta, Georgia.  Brij Kapoor served as a Director of the Bank from at least 2005 until the Bank closed in December 2008.

11.     On information and belief, Defendant, Balvant R. Patel is a resident citizen of Stockbridge, Georgia.  Balvant R. Patel served as a Director of the Bank

from 1999 until the Bank closed in December 2008.  During relevant times, Balvant R. Patel also served as a member of the Loan Committee.

12.   On information and belief, Defendant Dhiru Patel is a resident citizen of Marietta, Georgia.   Dhiru Patel served as a Director of the Bank from at least 2003 until the Bank closed in December 2008.  During relevant times, Dhiru Patel also served as a member of the Loan Committee.

13.   On information and belief, Defendant Kunal S. Patel is a resident citizen of Griffin, Georgia.  Kunal S. Patel served as a Director of the Bank from at least 2007 until the Bank closed in December 2008.

14.   On information and belief, Defendant Mukesh Patel aka Mike Patel is a resident citizen of Atlanta, Georgia.  Mike Patel served as a Director of the Bank from 1999 until the Bank closed in December 2008.  During relevant times, Mike Patel also served as a member of the Loan Committee.

15.   On information and belief, Defendant Mukund Patel is a resident citizen of Duluth, Georgia.  Mukund Patel served as a Director of the Bank from 1999 until the Bank closed in December 2008.  During relevant times, Mukund Patel also served as a member of the Loan Committee.

16.     On information and belief, Defendant Narendra D. Patel is a resident citizen of Acworth, Georgia.  Narendra D. Patel served as a Director of the Bank from at least 1999 until the Bank closed in December 2008.  During relevant times, Narendra D. Patel also served as a member of the Loan Committee.

17.     On information and belief, Defendant, R. C. Patel is a resident citizen of Duluth, Georgia.  R.C. Patel served as a Director of the Bank from at least 2001 until the Bank closed in December 2008.  During relevant times, R.C. Patel also served as a member of the Loan Committee.

18.     On information and belief, Defendant, B. Ruth Strickland is a resident citizen of Norcross, Georgia.  B. Ruth Strickland served as a Director of the Bank from at least 2003 until the Bank closed in December 2008.

19.     On information and belief, Defendant, Alan Tallis is a resident citizen of Dallas, Texas.  Alan Tallis served as a Director of the Bank from at least 2006 until the Bank closed in December 2008.  During relevant times, Alan Tallis also served as a member of the Loan Committee.

20.     On information and belief, Defendant Michael F. Johnston is a resident citizen of Fayetteville, Georgia.  Among other capacities, during all relevant times, Michael F. Johnston served as the Bank's Chief Financial Officer.

21.     On information and belief, Defendant Mark Donovan is a resident citizen of the state of Georgia.  Among other capacities, during all relevant times, Mark Donovan served as the Bank's Senior Credit Officer.

## IV.  BACKGROUND

22.     Prior to December 12, 2008, the Bank was a state banking institution organized and existing under the laws of Georgia with its principal place of business in Duluth, Gwinnett County, Georgia.  Pursuant to the Official Code of Georgia § 7-1-60 and/or other applicable statutes and regulations, the affairs of the Bank were subject to the supervision and regulation of the Georgia Department of Banking and Finance ("GDBF").

23.     The Bank was formed in 1999 and, during all times material to the allegations set forth herein, it was a wholly-owned subsidiary of Haven Trust Bancshares, Incorporated ("HTBI"), which filed for Chapter 7 bankruptcy on February 23, 2009.

24.     From its inception, the Bank grew at a rapid pace, increasing its assets from approximately $29 million in 2000 to $575 million at the time it closed in 2008.

25.    The Bank achieved its rapid growth with non-core funding, including brokered deposits, used to fund high risk ADC loans and other types of CRE loans.

26.    The Bank's percentage of ADC loans as a percentage of total capital ranged from 415 to 626 percent from December 2003 though September 2008, compared to 67 to 124 percent for its peer group.

27.    From 2002 through 2006, the FDIC and GDBF each expressed their growing concerns about the Bank's lending function.   Examiners repeatedly criticized the Bank's senior management and Board of Directors for failing to control risk in the Bank's loan portfolio.   Among others, the Bank's deficiencies included (1) a rapid growth strategy coupled with weak underwriting that resulted in a high-risk loan portfolio concentrated in CRE loans; (2) weak loan policies; (3) failure to comply with examiner recommendations; and (4) failure to comply with laws and regulations.

28.    For many years, federal bank regulators have used the CAMELS rating system to classify a bank's overall condition.   CAMELS is an acronym for Capital adequacy, Asset quality, Management, Earnings, Liquidity, and Sensitivity to market risk.   Regulators rate each factor on a scale of 1 (strongest) to 5 (weakest) and then use the average of all factors as the Composite rating.   A "1" rating

denotes strong performance and no cause for concern.  A "2" rating indicates that a bank is fundamentally sound and is in substantial compliance with all laws and regulations.  Banks that receive a rating of "3" are generally considered to have weaknesses that, if not corrected within a reasonable time, could lead to significant solvency or liquidity concerns.  A  rating of "4" indicates serious unsafe and unsound practices and/or serious financial or managerial deficiencies that result in unsatisfactory performance.  A "5" rating denotes the existence of extremely unsafe and unsound conditions, the number and severity of which are beyond management's ability or willingness to correct.

29.    In connection with its September 2000 examination, the Bank's "Earnings" and "Sensitivity to market risk" received a CAMELS 3 rating.  At or about the same time, the FDIC warned the Board and management that they were not adequately identifying and monitoring liquidity and sensitivity to market risk. The FDIC also noted an apparent violation of Regulation O based on extensions of credit to Director Mike Patel that exceeded five percent of the Bank's unimpaired capital and surplus.

30.    In connection with its March 2004 examination, the GDBF noted 56 instances in which extensions of credit to Directors Mike and R.C. Patel violated

Regulation O.   At that time, the GDBF instructed the Board of Directors and management to closely monitor transactions involving Mike or R. C. Patel.

31.   In connection with its June 2005 examination, the FDIC noted inadequate real estate appraisals, real estate loans that failed to comply with appropriate loan-to-value ("LTV") ratios, and other deficiencies.   The FDIC instructed the Bank's management and Board to correct these deficiencies.

32.   Despite the FDIC's 2005 observations and directives, in connection with its August 2006 examination, the GDBF again noted real estate loans that exceeded appropriate LTV ratio limits.   The GDBF also noted management's failure to comply with FDIC Rules and Regulations with respect to identifying and reporting such loans to the Board on a quarterly basis.   In response to the GDBF's criticisms, management and the Board agreed to comply with these Rules and Regulations in the future.

33.   Although the Bank's loan policy set forth LTV ratio limits that were identical to the LTV ratio standards recommended by the FDIC and GDBF, Defendants continuously disregarded the Bank's loan policy, as well as the directives of the FDIC and GDBF.

34.     In January 2008, the Bank's CAMELS ratings for "Asset Quality" and "Management" dropped to "4" and "3," respectively.  The Bank's Composite rating also dropped to CAMELS 3.  At that time, the FDIC noted very poor asset quality, substantial deficiencies in capital, and poor underwriting practices.  The underwriting deficiencies again included inadequate LTV ratios, incomplete or outdated information concerning borrowers' finances and ability to repay, and little or no borrower equity in ADC projects.

35.     On February 27, 2008, the Bank's executive officers, including Defendants Edward Briscoe, Mark Donovan, and Michael F. Johnston, met with FDIC representatives to discuss the results of the 2008 FDIC examination.  The FDIC examination staff expressed serious concern regarding the Bank's increasing volume of adversely classified assets, impaired loan underwriting and credit administration policies, and inadequate capital levels.  The FDIC examination staff also noted deficiencies in the Bank's compliance with applicable laws and regulations and its need to improve internal CRE lending policies and procedures.

36.     During the February 2008 meeting, the FDIC examiners stressed the FDIC's dissatisfaction with the Bank's overall condition.  The examiners specifically noted the Bank's poor asset quality.  The examiners also criticized the

Bank's failure to adopt loan policies that offered specific guidance with respect to CRE concentrations that had exposed the Bank to significant risk. Additionally, the examiners observed that approximately 58 percent of the Bank's loans were adversely classified as of December 31, 2007 and that liquidity, fund management practices, and capital were all less than satisfactory. Finally, the examiners warned that excessive dividend payments to the Bank's parent company were impairing capital growth.

37.    On or about April 17, 2008, Defendant Edward Briscoe communicated the FDIC's concerns to the other members of the Bank's Board, including those who are named Defendants herein. In response, the Board requested management to prepare an "Action Plan" to address the FDIC's concerns.

38.    On May 8, 2008, the Board met with FDIC representatives to review deficiencies with respect to the Bank's capital levels, impaired loan underwriting and credit administration policies, and escalating volume of adversely classified assets. The Board and the FDIC also reviewed the Action Plan, which required the Bank to raise additional capital or reduce its volume of CRE lending. As discussed in more detail below, the Defendants failed to implement the Action Plan and they ignored the FDIC's concerns.

39.   Although Defendants promised to correct the Bank's underwriting deficiencies and curtail CRE lending, they subsequently approved significant CRE loans and reductions in capital to asset ratios in order to facilitate the granting of new CRE loans.   From January 1, 2008, until it failed on December 12, 2008, Defendants approved new loans or renewed existing loans totaling over $175 million in the aggregate.   Most of those loans were CRE loans.   Moreover, a majority of those loans had underwriting deficiencies that were the subject of previous regulatory criticisms.

40.   Although both the FDIC and the GDBF had on numerous prior occasions criticized the Bank for its failure to abide by established LTV limits, the underwriting deficiencies included, once again, deficient LTV computations.   Many of the loans also contained incomplete or outdated financial information to assess a borrower's ability to repay and included little or no borrower equity in the projects.

41.   Even without the benefit of the FDIC's and GDBF's repeated warnings, Defendants should have curbed the Bank's imprudent and reckless CRE lending practices.   The Bank's return on assets plunged in 2007 and the decline accelerated in the second quarter of 2008 as credit markets tightened.   Despite

FDIC's warning and obvious downturn in the economy, Defendants accelerated the Bank's CRE lending until the GDBF forced them to stop in October 2008.

42. Imprudent loans made on or after April 17, 2008, include but are not limited to the following:

| Date | Borrower | Loan Amount | Loss Est. |
|------|----------|-------------|-----------|
| 04/17/08 | Jay R. Patel | $  748,750 | $  748,750 |
| 04/19/08 | OM SAI Hospitality, Inc. | 2,603,721 | 754,725 |
| 04/23/08 | Bavajit Hospitality LLC | 3,000,000 | 972,116 |
| 05/09/08 | Moin, Inc | 1,345,000 | 440,585 |
| 05/09/08 | K&S Hospitality, LLC | 3,570,000 | 1,835,441 |
| 05/15/08 | Affordable Hospitality Group | 3,411,782 | 2,311,848 |
| 05/30/08 | Richardson Commercial Property | 1,200,000 | 455,759 |
| 06/05/08 | Vince Merolla Enterprises, Inc. | 3,100,000 | 3,097,829 |
| 06/26/08 | SAI Hospitality, LLC | 4,201,600 | 1,384,842 |
| 06/30/08 | Bombay Grill's Kitchen Co. | 1,591,570 | 871,383 |
| 06/30/08 | Sunharrah, Inc. | 1,550,000 | 1,366,152 |
| 07/14/08 | Tamelia Harper & Paul Head | 2,100,000 | 2,100,000 |
| 07/22/08 | Palmetto Hospitality, Inc. | 13,622,412 | 750,000 |
| 07/25/08 | SAI Properties, Inc. | 1,530,000 | 484,876 |
| 07/25/08 | American Hotels-Manchester G.P. | 3,520,808 | 2,556,571 |
| 07/30/08 | Sadguru SAI, Inc. | 1,533,173 | 1,003,610 |
| 07/30/08 | Balaji LLC | 4,500,000 | 1,447,649 |
| 08/07/08 | Chadni LLC | 3,500,000 | 1,181,858 |
| 08/26/08 | Value Place Alpharetta LLC | 6,212,719 | 2,117,480 |
| 08/29/08 | GDG Investments LLC | 3,000,000 | 989,740 |
| 09/18/08 | Hemant Patel | 1,200,000 | 385,461 |
| 09/19/08 | Sapna Hotel Group Peachtree Cl | 4,150,000 | 1,409,122 |

| 09/29/08 | Market Haven Commons, LLC | 5,000,000 | 2,520,969 |
| 10/27/08 | Fairview Commercial Lending | 1,000,000 | 684,958 |
| 10/31/08 | Moreland 475 LLC | 1,350,000 | 815,561 |

43.     By way of example, in May 2008, the Loan Committee approved a $4.2 million loan to SAI Hospitality, Inc. ("SAI"), a single asset corporation with no assets or operating history.  The loan was to fund the purchase of a hotel.  At the time, the hotel's cash flow was insufficient to cover the proposed debt service.  Additionally, the loan file does not support the purchase price of the property and the appraisal in the file does not support the Bank's minimum LTV ratio.  The borrower's tax returns and financial statements were not signed.  The deficiencies in the SAI loan clearly demonstrate the Defendants' blatant disregard for prudent underwriting and disbursement standards, as well as violations of the Bank's lending policy.  Losses on imprudent CRE loans such as SAI currently exceed $30 million.

44.     During relevant times, the Bank's internal policies limited its capital-to-asset ratio to a minimum of seven percent (7%).  In order to support the Bank's accelerated CRE lending in the Summer of 2008, the Board decisively disregarded that limit.  On June 19, 2008, Defendant Johnston, as CFO and Secretary to the Board, reported that "due to declining earnings and increasing asset growth," the Bank failed to meet the seven percent capital-to-asset ratio.  In response, the

Director Defendants simply voted unanimously to accept the policy violation. They made similar votes on August 28, 2008, and September 22, 2008.

45.     The Bank's capital-to-asset ratios dropped to 5.98 percent as of July 31, 2008, and 5.63 percent as of August 31, 2008.

46.     Despite the deterioration of the Bank's earnings and the decline in its capital-to-asset ratio to unacceptable levels, the Board authorized imprudent dividend payments to HTBI. The Board approved dividend payments to HTBI of $300,000 on April 17, 2008, and $111,811 on August 28, 2008.

47.     During all relevant times, Defendants R. C. Patel and Mike Patel were brothers who owned a controlling interest in the Bank.

48.     In addition to the foregoing loans, Defendants R. C. Patel and Mike Patel caused the Bank to make numerous loans for their own personal benefit. In connection with those loans, the other named Defendants negligently failed to take any action to prevent the loans, to ensure that proper approval procedures were followed, or to monitor the use of the loan proceeds.

49.     By way of example, on March 16, 2007, Defendants approved a $1.2 million loan to UV Hotels, LLC, (hereinafter referred to as the "UV Hotels Loan"). UV Hotels, LLC was owned by the brother-in-law of R. C. Patel and Mike Patel.

The UV Hotels Loan was originated to acquire commercial real estate in Atlanta, Georgia.  The appraisal in the loan file valued the real estate at $585,000, one half of the amount funded.  In October 2007 the loan amount was increased to $4.7 million, purportedly to fund construction of a shopping center.  But approximately $700,000 of the construction loan proceeds was diverted for the benefit of R.C. and/or Mike Patel.  On April 5, 2008, Defendants extended the term and reduced the interest rate of the UV Hotels Loan.  On September 8, 2008, Defendants again extended the term and reduced the interest rate of the UV Hotels Loan.  Even after becoming aware of the FDIC's admonitions with respect to the Bank's underwriting, loan disbursement, and insider lending policies, Defendants took no steps to monitor appropriate distributions of the loan proceeds.  Currently, the loss on the UV Hotels Loan exceeds $4 million.

50.    On April 18, 2008, the Bank extended a line of credit to Jay R. Patel, son of Defendant R. C. Patel, in the amount of $748,450 (hereinafter referred to as the "Jay Patel LOC").  The terms of the loan were interest only for 24 months, with the entire balance due in one balloon payment on April 18, 2010.  The collateral for the loan was 71,000 shares of High Trust Bank stock, certificate No. 5, represented as having a value of $1,065,000.  The stated purpose of the line of credit was "for a

closing." The Bank's loan file contains a handwritten loan application signed by Jay Patel and dated April 18, 2008. However, the Bank's loan committee minutes reflect that the loan committee (including Mike Patel) approved this line of credit on April 17, 2008, the day before the loan application. The loan was not listed on the formal agenda for the meeting and is the last item referenced in the minutes. The minutes do not reflect any discussion of the proposed credit, but simply state that it was approved. Proceeds from the Jay Patel LOC were ultimately deposited into bank accounts controlled by Defendants R. C. Patel and/or Mike Patel and were used by them for their own personal benefit.

51. On May 14, 2008, the Bank established personal lines of credit for four other adult children of Mike Patel and R. C. Patel, each of whom received a personal line of credit in the amount of $500,000 (hereinafter referred to as the Children's Loans). Defendant Donovan served as the account officer who presented the loans and recommended them for approval. At the times of these credits, the children lacked sufficient income to repay these debts. Similar to the Jay Patel LOC, each of these credits required payments of interest only for a period of 12 months, with a final balloon payment due on May 14, 2009. Each of the loans was secured by 57,500 shares of "High Trust Bank stock" valued at $862,500. At

the time of the loans, the stock had been pledged previously to secure a loan from another bank.   Although the loan files reflect approval by the Bank's loan committee, the loan committee minutes make no reference to any of these four loans.   The proceeds from these four lines of credit were ultimately deposited into bank accounts controlled by Defendants R. C. Patel and/or Mike Patel and were used by them for their own personal benefit.

52.   On August 14, 2008, the Bank extended a line of credit in the amount of $3,357,500 to an entity named RM Kid One, LLC. (hereinafter referred to as the "RM Kid LOC").   The repayment terms required payments of interest only for 12 months.   The entire principal balance was payable in one balloon payment due on August 14, 2009.   The loan committee memorandum stated that RM Kid One, LLC was "100% owned by … the son of … RC Patel."   The alleged purpose of the loan was to enable RM Kid One, LLC to acquire a motel for $4,050,000.   The guarantor of this loan had other debt to the Bank which was not reflected on the financial statement submitted in support of the loan.   The guarantor's net worth was not sufficient to repay the loan.   Moreover, a significant portion of the guarantor's net worth was attributable to stock in a closely held entity that was already pledged to secure his other debt to the Bank.   Loan committee minutes of August 13, 2008,

reflect that the loan committee approved the loan.  Proceeds from this loan were ultimately deposited into bank accounts controlled by Defendants R. C. Patel and/or Mike Patel.

53.    The losses sustained on the insider loans made for the benefit of R. C. Patel and/or Mike Patel exceed $7 million.

54.    To address ongoing concerns, including apparent violations of laws and regulations, inadequate risk management controls, and other safety and soundness issues, the FDIC and the Bank entered into a memorandum of understanding in September 2008.  Also, in August and November 2008, the FDIC issued Prompt Corrective Action ("PCA") letters notifying the Bank that it was no longer able to accept, renew, or roll over brokered deposits without FDIC approval.  The Bank was closed by the GDBF on December 12, 2008.  In its final analysis of the Bank's failure, the GDBF noted that, as of December 1, 2008, the Bank was not in compliance with 12 of the 18 provisions set forth in the memorandum of understanding.

55.    The GDBF also found that the Board and senior management, including the Defendants named herein, were unable and unwilling to indentify,

measure, monitor, and control the Bank's risks, or to address lending and operational weaknesses identified by the FDIC in January 2008.

56.     From at least January 2008 forward, Defendants, and each of them, breached their duties as officers and directors of the Bank by continuing to grow the Bank's loan portfolio with knowledge that the Bank's losses and levels of asset growth had driven capital ratios below board-approved risk limits.

57.     While having knowledge of significant lending and operational weaknesses identified at previous examinations, Defendants, and each of them, breached their duties as officers and directors of the Bank by allowing the Bank to extend more than 25 percent of the Bank's legal lending limit to R.C. and Mike Patel.

58.     After the GDBF closed the Bank on December 12, 2008, the FDIC accepted the appointment as its receiver pursuant to 12 U.S.C. § 1821(c).  Upon acceptance of the appointment as the receiver, the FDIC took possession of and title to all assets, business, and property of every kind of the Bank which was not otherwise disposed of, including all claims alleged in this action, passed to the FDIC by operation of law and became vested in the FDIC, as receiver of the Bank.  The FDIC in its receivership capacity is the real party in interest herein.

## V.  VIOLATIONS AND BREACHES

59.    Among other duties, as Chief Executive Officer, Briscoe was responsible for the overall management of the Bank, including but not limited to ensuring that the Bank had adequate loan policies, procedures and internal controls, that the Bank adhered to those loan policies, procedures and internal controls, and that the Bank pursued a business model consistent with safe and sound banking practices.

60.    Among other duties, as Chief Financial Officer, Johnston was responsible for monitoring the Bank's fiscal performance and advising senior management and the Board on matters of fiscal control and profitability to (a) ensure compliance with applicable laws and regulations, (b) ensure compliance with the Bank's internal policies and procedures, and (c) act in a manner consistent with safeguarding the Bank's assets.

61.    Among other duties, as Senior Credit Officer, Donovan was responsible for providing support and direction in the adoption of appropriate loan policies, procedures, and internal controls, monitoring lending activity and supervising Bank personnel to secure compliance with those loan policies, procedures, and internal controls, and otherwise ensuring the overall quality of the Bank's loan portfolio.

62.     Among other things, as members of the Bank's Loan Committee, Edward Briscoe, Balvant R. Patel, Dhiru Patel, Mike Patel, Mukund Patel, Narendra D. Patel, R.C. Patel, and Alan Tallis, were responsible for analyzing loan applications and supporting documentation to ensure that loans were properly documented and otherwise satisfied the Bank's lending policies as well as prudent lending practices.

63.     Among other things, as Directors of the Bank, Edward Briscoe, Ken Cutshaw, Scott Dix, Brij Kapoor, Balvant R. Patel, Dhiru Patel, Kunal S. Patel, Mike Patel, Mukund Patel, Narendra D. Patel, R. C. Patel, B. Ruth Strickland and Alan Tallis, were responsible for selecting, monitoring, and evaluating management; establishing business strategies and policies; monitoring and assessing the Bank's business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; reviewing and approving the actions of the Loan Committee, including but not limited to the Loan Committee's action in approving the CRE and insider loans referenced herein; following and implementing the advise of regulators; and making business decisions on the basis of fully informed and meaningful deliberation.

64.    In addition to the foregoing, the Official Code of Georgia § 7-1-490(a) provides in pertinent part as follows: "Directors and officers of a bank or trust company shall discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like positions."   The Bank Director Handbook prepared and published by the Georgia Department of Banking and Finance similarly provides as follows:

> The Financial Institutions Code of Georgia (Code) declares that bank directors must discharge their duties "in good faith and with the diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." (O.C.G.A. § 7-1-490). This "ordinary negligence" standard of performance has been required for years by Georgia courts. They regard directors as agents of the bank "clothed with fiduciary character" — that is, owing a fiduciary duty of good faith and due care to the corporation. Any failure to meet this legal responsibility subjects the bank director to personal liability for any resulting losses to the bank, its depositors or other creditors.

65.    Each of the Defendants, collectively and individually, owed obligations and duties to the Bank by virtue of their positions as officers and/or directors of the Bank.  Each Defendant was obligated by statute and common law to carry out their individual and collective responsibilities with the same degree of care, skill, and diligence that ordinarily prudent persons in like positions would exercise under

similar circumstances.  These duties extend to the management and administration of the affairs of the Bank in accordance with applicable laws and regulations, and in accordance with safe, sound, and prudent banking practices and procedures.  These obligations and duties of the Defendants were owed not only to the Bank, but extended also to its depositors and shareholders.

66.    The Defendants and each of them failed, neglected or refused to fully and properly discharge their duties and obligations, and failed, neglected or refused to exercise that degree of care, skill, diligence, obedience to law and good faith which persons similarly situated would have exercised.  Each of the Defendants caused or permitted some or all of the following acts or omissions, among others:

a.    Violations of Laws and Regulations - Causing or permitting (1) violations of applicable laws and regulations, including, but not limited to, those fixing institutional lending limits; (2) those relating to loans to insiders, and (3) violations of the Bank's own internal policies, including but not limited to loan policies and lending limitations;

b.    Failure to Establish, Enforce and Follow Adequate Loan Policies - Failing to establish loan policies with respect to substantial lending activities over substantial periods of time; and, to the extent lending policies and

procedures were established, failing to enforce and follow such policies and procedures and to insure that such policies and procedures were reasonable and adequate for their intended purposes, including but not limited to the failure to adopt and enforce prudent underwriting standards, the failure to follow policies regarding LTV ratios, the failure to follow policies regarding capital-to-asset ratios, the failure to follow policies in connection with loans to insiders;

        c.   <u>Inadequate Investigation</u> - Failing to inform themselves and each other about the true nature and condition of the Bank's loan portfolio, and failing adequately to review and inquire into the Bank's loan transactions;

        d.   <u>Failure to Heed Regulatory Warnings</u> - Failing to establish and adhere to policies and procedures that took into account the warnings and criticisms of the Bank by regulatory authorities, including but not limited to the failure adopt and enforce prudent underwriting procedures, the failure to enforce appropriate loan-to-value rations, approving and/or acquiescing in the imprudent growth of the Bank's CRE and ADC loan portfolios, failing to maintain appropriate capital-to-asset ratios, approving and/or acquiescing in the payment of imprudent dividends, approving or acquiescing in the approval of improper loans to insiders, and/or failing to monitor and control improper loans to insiders.

       e.    <u>Loans to Non-Creditworthy Borrowers</u> - Causing or permitting loans to be made to borrowers who were or should have been known to be uncreditworthy or who demonstrated a lack of ability to repay their loan;

       f.    <u>Inadequate Financial Information</u> - Causing or permitting loans to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower, the borrower's prospective source of repayment, and the borrower's security, if any, and failing to make reasonable efforts to verify the accuracy of such information;

       g.    <u>Inadequate Loan Documentation</u> - Causing or permitting the Bank to maintain inadequate loan documentation and files;

       h.    <u>Unsecured and undersecured Loans</u> - Causing or permitting loans to be made on an unsecured or inadequately secured basis, including but not limited to repeated violations of policies and regulations pertaining to appropriate LTV ratios;

       i.    <u>Inadequate or Non-Existent Appraisals</u> - Causing or permitting loans to be made on the basis of inadequate or non-existent appraisals;

j.      <u>Failure to Perfect and Maintain Collateral</u> - Causing or permitting loans to be made without properly and promptly perfecting security interests in the loan collateral;

k.      <u>Diversion of Loan Proceeds</u> - Causing or permitting loans to be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application; and failing to control the disbursement of loan proceeds, set up adequate reserves, and insure that loan proceeds were not wasted and dissipated;

l.      <u>Loan Repayment Programs</u> - Causing or permitting loans to be made without requiring, establishing, supervising or enforcing realistic and prudent repayment programs;

m.      <u>Loan Extensions and Renewals</u> - Causing or permitting loans to be renewed or extended without any reduction in principal, and without taking proper steps to obtain security or otherwise protect the Bank's interests;

n.      <u>Inadequate Collection Procedures</u> - Failing to establish or follow adequate procedures to collect delinquent loans;

o. <u>Selection and Supervision of Officers</u> - Failing to exercise the required degree of care in selecting and supervising the Bank's officers and employees in the discharge of their duties; and

p. <u>Investment and Liquidity Policy</u> - Failing properly to manage Bank liquidity.

q. <u>Capital-to-Asset Ratio</u> - Failing to maintain appropriate capital-to-asset ratios, including but not limited to the failure to adhere to the Bank's internal requirements regarding capital-to-asset ratios.

r. <u>Insider loans</u> - Failing to ensure adherence to internal policies and procedures with respect to the approval of loans to insiders, failing to ensure compliance with Regulation O and other applicable laws and regulations, as well as a general failure to monitor or control insider loans.

s. <u>Management and Supervision</u> - The Defendants, collectively and individually, failed generally to exercise their duties to manage and supervise the affairs of the Bank in a safe, sound and prudent manner consistent with their duty to protect the assets of the Bank.

67. In connection with the aforementioned acts and omissions, Defendants, individually and collectively, made uninformed decisions without meaningful

deliberation.  Under the circumstances, the decisions made and actions taken by the Defendants constitute abuses of discretion and/or rise to the level of bad faith.

## VI.  CAUSES OF ACTION

**A.**     **Count 1 – Negligence Against All Defendants.**

68.     FDIC incorporates by reference each of the allegations in paragraph 1 through 67 of this complaint.

69.     Each of the Defendants, as officers and/or directors of the Bank, owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in the management, supervision and conduct of the Bank's business and financial affairs.

70.     By their actions and inactions, as described specifically and generally herein, each of the Defendants failed and neglected to perform their respective duties as officers and/or directors of the Bank, constituting breaches of their statutory and common law duties of care owed to the Bank.

71.     By way of example and not of limitation, Defendants failed to address the concerns and criticisms of bank regulators.  Especially in light of those concerns and criticisms Defendants knew, or in the exercise of reasonable diligence should

have known, that their practices and the practices of other Bank officers and employees over whom they exercised supervisory control were improper, imprudent and harmful to the Bank.  Among other things, Defendants were are aware, or in the exercise of reasonable diligence, should have been aware of significant weaknesses in the Bank's underwriting practices and procedures.  Defendants were also aware, or in the exercise of reasonable diligence, should have been aware of the deterioration of the Bank's loan portfolio caused by imprudent CRE and ADC lending.  Defendants were aware, or in the exercise of reasonable diligence should have been aware of the negative impact on the Bank's earnings, liquidity and capital-to-asset ratio caused by high risk CRE and ADC loans.  Despite their knowledge, Defendants accelerated and/or permitted others to accelerate the underwriting and approval of high risk CRE and ADC loans.

72.    During calendar year 2008 in particular, Defendants were aware, or in the exercise of reasonable diligence should have been aware of the serious decline in the Bank's earnings, the quality and performance of its assets, and of the Bank's unacceptably low capital-to-asset ratio.  Defendants also knew, or in the exercise of reasonable diligence should have known, that the Bank's financial condition did not justify the payment of any dividends to its parent, and that the payment of such

dividends would only worsen the financial condition of the Bank.  Despite that knowledge, Defendants approved or permitted others to approve the payment of dividends exceeding $411,000.

73.    In addition, Defendants knew, or in the exercise of reasonable diligence should have known that the Bank made numerous improper and imprudent insider loans for the benefit of Directors Mike Patel and R. C. Patel.

74.    As a direct and proximate result of the negligent acts and omissions of each Defendant, the Bank suffered damage and sustained losses exceeding $40 million, or such other amount as may be proved at trial.

75.    With respect to their actions and inactions in managing the affairs of the Bank, Defendants pursued a common plan or design and, therefore, each Defendant is jointly and severally liable for all losses.

**B.**    **Count 2 – Breach of Fiduciary Duty Against All Defendants.**

76.    FDIC incorporates by reference each of the allegations in paragraph 1 through 75 of this complaint.

77.    Each of the Defendants, as officers and/or directors of the Bank, served in a fiduciary capacity and owed the Bank fiduciary duties to exercise the highest

degree of care, as well as complete loyalty, honesty and good faith in the management, supervision and conduct of the Bank's business and financial affairs.

78.     By their actions and inactions, as described specifically and generally herein, each of the Defendants failed and neglected to perform their respective duties as officers and/or directors of the Bank, constituting breaches of their fiduciary duties owed to the Bank.

79.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties, the Bank suffered damage and sustained losses exceeding $40 million, or such other amount as may be proved at trial.

80.     With respect to their actions and inactions in managing the affairs of the Bank, Defendants pursued a common plan or design and, therefore, each Defendant is jointly and severally liable for all losses.

C.     <u>**Count 3 - Gross Negligence—Violation of The Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") against All Defendants.**</u>

81.     FDIC incorporates by reference each of the allegations in paragraph 1 through 80 of this complaint.

82.     Section 1821 (k) of FIRREA holds directors or officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.

83.    The Defendants' actions and inactions as described herein exhibit such a degree of carelessness and/or inattention as to constitute gross negligence under Georgia law.

84.    As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, the Bank suffered damage and sustained losses exceeding $40 million, or such other amount as may be proved at trial.

85.    With respect to their grossly negligent actions and inactions in managing the affairs of the Bank, Defendants pursued a common plan or design and, therefore, each Defendant is jointly and severally liable for all losses.

## VII.  RELIEF REQUESTED

86.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC demands a trial by jury on all claims.

87.    On Counts 1-3, the FDIC prays for judgment against all Defendants, jointly and severally, in sums to be proven at trial, together with appropriate interest pursuant to 12 U.S.C. § 1821(l), the costs of this action, and such other and further relief as the Court deems just and proper.

## CERTIFICATION PURSUANT TO LOCAL RULES

Pursuant to the Local Rules this certifies that this document was prepared using the New Times Roman font in 14 point. These font and point selections are approved by L.R.5.1CB.

Respectfully submitted,

By: ___s/Jeffrey E. Tompkins_____
       Jeffrey E. Tompkins (GA. Bar # 714608)
       THOMAS KENNEDY SAMPSON &
       TOMPKINS LLP
       3355 Main Street Atlanta, Georgia 30337
       (404) 688-4503 (Telephone)
       (404) 761-3224 (Telecopier)
       j.tompkins@tkstlaw.com

       and

       Robert E. Craddock, Jr. (TN Bar # 5826)
       Douglas A. Black (TN Bar # 11412)
       WYATT TARRANT & COMBS, LLP
       1715 Aaron Brenner Drive, Suite 800
       Memphis, TN  38120
       (901) 537-1000 (Telephone)
       (901) 537-1010 (Telecopier)
       rcraddock@wyattfirm.com
       dblack@wyattfirm.com

       Attorneys for the Federal Deposit Insurance
       Corporation, as Receiver for Haven Trust Bank